**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

CHABAD OF BROOKVILLE, INC.,
RABBI MENACHEM HEBER, and
SHIFRA HEBER,

Plaintiffs,

v.

INCORPORATED VILLAGE OF UPPER BROOKVILLE and INCORPORATED VILLAGE OF UPPER BROOKVILLE BOARD OF ZONING APPEALS, a/k/a INCORPORATED VILLAGE OF UPPER BROOKVILLE ZONING BOARD OF APPEALS,

Defendants.

Civ. No. 2:25-cv-944

**COMPLAINT**

Plaintiffs CHABAD OF BROOKVILLE, INC, RABBI MENACHEM HEBER and SHIFRA HEBER (hereinafter "Plaintiffs"), by and through their undersigned counsel, Storzer & Associates, P.C., and Mahon & Berger, respectfully allege as follows:

## INTRODUCTION AND NATURE OF THE ACTION

1. This action is brought by Plaintiffs to redress violations of civil rights, as protected by the Free Exercise Clause of the First Amendment and Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc, *et seq.* ("RLUIPA"), the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, and 42 U.S.C. §§ 1981 and 1982, caused by the Defendants' burdensome, discriminatory and unreasonable land use regulations and actions, both on their face and as applied to Plaintiffs.

2. Plaintiffs have been attempting to use real property located at 1447 Cedar Swamp Road in Upper Brookville, New York (the "Property") as a Jewish synagogue for approximately seventeen years.

3. Plaintiffs' current synagogue on the Property inside the Rabbi Heber's home is woefully inadequate for its religious needs.

4. As such, Plaintiffs have been attempting to navigate the land use processes of the Incorporated Village of Upper Brookville (the "Village" or "Upper Brookville") and its Board of Zoning Appeals' land use process for over ten years in their efforts to construct a dedicated synagogue on the Property that can accommodate their faith and needs.

5. These efforts have been met with repeated delays by the Defendants, attempts by Defendants to apply conditions that are in conflict with their zoning code, and repeated attempts to raise issues that were previously addressed and included factually incorrect claims, apply discriminatory standards to the Plaintiffs, and unreasonably obstruct the application.

6. Plaintiffs have been forced to modify their plans at least *twenty-two* times since submitting their application ten years ago, usually to satisfy the whims of the Defendants, who continually raise additional new issues once prior issues have been resolved.

7. Defendants have prohibited and continue to prohibit the Plaintiffs from adequately using the Property for purposes of religious exercise. They have targeted the Plaintiffs and discriminated against them based on their Jewish faith and race.

8. Now, ten years after Plaintiffs filed their application, on October 30, 2024 the Defendants issued a "Positive Declaration" under New York's State Environmental Quality Review ACT ("SEQRA"), demanding yet more "further study and consideration" of issues that had been addressed numerous times previously by the Plaintiffs. This determination that a

modest house of worship will have a "significant" adverse impact on the environment, despite a decade of addressing the Village's purported concerns, will add years to the application and hundreds of thousands of dollars in expenses for the Plaintiffs.

9. The Defendants' weaponization of land use and environmental laws to prevent the religious exercise of a small Orthodox Jewish congregation violates Plaintiffs' federal statutory and constitutional rights.

10. Plaintiffs seek declaratory and injunctive relief to protect their right to exercise their religious beliefs without discrimination and undue burden, as well as compensatory and punitive damages for the Defendants' willful violation of their civil and constitutional rights.

## **JURISDICTION AND VENUE**

11. The subject matter jurisdiction of this Court is founded upon 28 U.S.C. § 1331 (federal question jurisdiction) in that this action is brought under RLUIPA, the Fair Housing Act., 42 U.S.C. § 1981, 42 U.S.C. § 1982, and 42 U.S.C. § 1983.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the acts and transactions complained of occurred, and continue to occur, in this District.

## **PARTIES**

13. Plaintiff CHABAD OF BROOKVILLE, INC. (the "Chabad") is a Religious Corporation of the State of New York organized on June 30, 2000, and whose Articles of Incorporation were amended on December 13, 2007, and having a principal place of business at 1447 Cedar Swamp Road, Glen Head, New York 11545.

14. Plaintiff RABBI MENACHEM HEBER is a citizen of the State of New York with an address of 1447 Cedar Swamp Road, Glen Head, New York 11545.

15. Plaintiff SHIFRA HEBER is a citizen of the State of New York with an address of

1447 Cedar Swamp Road, Glen Head, New York 11545.

16. Defendant INCORPORATED VILLAGE OF UPPER BROOKVILLE is a municipal corporation duly formed and existing pursuant to the laws of the State of New York. The Village is a "government" within the meaning of 42 U.S.C. § 2000cc-5(4)(a).

17. Defendant INCORPORATED VILLAGE OF UPPER BROOKVILLE BOARD OF ZONING APPEALS, a/k/a INCORPORATED VILLAGE OF UPPER BROOKVILLE ZONING BOARD OF APPEALS ("BZA") is the duly appointed zoning board of appeals of Upper Brookville. The BZA is a "government" within the meaning of 42 U.S.C. § 2000cc-5(4)(a).

## FACTUAL ALLEGATIONS

### Plaintiffs' Religious Exercise

18. Rabbi Heber founded the Chabad in the year 2000 to serve the needs of the Jewish community in the Brookville area (including Upper Brookville and the separate and distinct Village of Brookville) because the area did not have a Chabad for its Jewish community.

19. A Chabad, as described more fully below, is the physical location in which a local branch of the Chabad-Lubavitch Jewish movement serves the spiritual needs of the Jewish community within the area where it is physically located.

20. Because the Brookville area did not have any storefront rental space for the Chabad to rent at the Chabad's inception, the Chabad began in the Glen Cove/Glen Head area of New York as the Chabad of Glen Cove in June 2000 in a storefront rental.

21. On December 13, 2007, the Chabad was officially reorganized as the Chabad of Brookville, Inc. (the "Chabad").

22. In July 2008, the Chabad purchased the Property at 1447 Cedar Swamp Road,

Glen Head, New York 11545, which is identified as Section 18, Block A, Lots 1057A and 1057B on the tax map of Nassau County Land and Tax Map.

23. The Property includes an existing building, which functions as both the residence for Plaintiffs Rabbi Heber and Shifra Heber, the Rabbi's spouse, as well as the location of the religious services and religious classes.

24. Plaintiff Chabad of Brookville, Inc. owns the Property.

25. Plaintiffs Rabbi Heber and Shifra Heber have a property interest in the Property as they will continue to live in the accessory building as a parsonage with a leasehold interest.

26. The Chabad is affiliated with the Chabad-Lubavitch movement, which is a major movement within mainstream Jewish tradition with its roots in the Chassidic movement of the 18th century. The Chabad-Lubavitch branch of Chassidism was founded in 1788. Today, Chabad-Lubavitch operates 3,500 locations in more than 85 countries.

27. The word "Chabad" is a Hebrew acronym for the three intellectual faculties of *chochmah* (wisdom), *binah* (comprehension), and *da'at* (knowledge). The word "Lubavitch" is the name of the town in Russia where the movement was founded. In 1927, Rabbi Yosef Yitzvak Schneerson was forced to leave the Union of Soviet Socialist Republics for Latvia and then Poland, and eventually fled to the United States because of the Holocaust. After his passing, Rabbi Menachem Mendel Schneerson took over as the leader of the movement. Rabbi Menachem Mendel Schneerson is credited with establishing the movement in the United States and nurturing its spread nationally and worldwide.

28. A part of Chabad-Lubavitch's religious mission is "[t]o create light for the sake of light, just by doing good for the sake of doing good, until all the world is filled with the serene light of G-dly wisdom 'as the waters cover the ocean floor.'"

29. Chabad-Lubavitch teaches that all people contain a divine spark. By welcoming all Jews into Chabad buildings of Jewish practice and learning, sometimes known as "Chabad houses," Chabad-Lubavitch seeks to transcend all labels of observant and non-observant Jews and see all Jews as an integral part of the family.

30. Chabad attempts to bring the teachings of Judaism to those who may be interested in learning about these teachings in a nonjudgmental and non-imposing manner to each person at their own pace.

31. A Chabad house is a Jewish community center serving the needs of the entire local Jewish community.

32. The need to establish a new Chabad house wherever Jews live is a core belief of the Chabad-Lubavitch movement and the Plaintiffs.

33. Each husband and wife team, the Rabbi and Rebbetzin, who head a Chabad house are emissaries on behalf of the Chabad-Lubavitch movement to all Jews in the communities they serve, but remain organizationally independent from other Chabad houses.

34. Chabad houses often serve as homes for Chabad-Lubavitch rabbis and their families and will also host prayer services, Hebrew School, lectures, Shabbat meals, and other religious events.

35. The Chabad has various programs to fulfill its religious mission for all ages.

36. The Chabad currently has a membership of approximately 100 families.

37. The Chabad offers religious programs for adults, including daily *minyanim* (a quorum of at least ten adult males over the age of 13 required for communal prayer in the Jewish faith), Torah studies, Shabbat service followed by a *kiddush* service (a reception after Shabbat service involving a blessing over a cup of wine and bread involving the recitation of verses), a

Hebrew School, and a Jewish Women's Circle.

38. However, the lack of an adequate facility severely impedes the Chabad's religious services and other programs.

39. The Chabad offers various life cycle events that are integral to Judaism, including bar mitzvahs, bat mitzvahs, *bris* ceremonies, and weddings.

40. Due to the constrained space of the residence in which the Chabad meets, Rabbi Heber is forced to hold these religious celebrations and ceremonies outdoors if the weather permits, inhibiting the Chabad's religious celebrations and ceremonies during inclement weather.

41. The Chabad is forced to eliminate most ceremonies in the winter due to weather conditions.

42. The space limitations at the current building cause most individuals to choose not to hold their bar mitzvahs, bat mitzvahs, *bris* ceremonies, or weddings at the Chabad.

43. During bar mitzvahs and bat mitzvahs at the Chabad, the families and friends attending these celebrations must be separated into different rooms because of the space limitations, impeding these religious celebrations.

44. The Hebrew School operated by the Chabad on the Property currently lacks the space to properly hold bar mitzvahs and bat mitzvahs.

45. Because of the Chabad's space limitations, Jewish families who are looking for space for their child's bar or bat mitzvah have chosen not to place their child in the Hebrew School because the bar or bat mitzvah cannot be properly accommodated.

46. Further, the Chabad's space limitations have negatively affected its religious services for its congregants.

47. Due to the space limitations in the current home on the Property, there is no lobby

for congregants to enter and therefore congregants must enter where people are praying, which is disrespectful according to the code of Jewish law.

48. At present, if each congregant is seated with minimal personal space, the existing Chabad can seat approximately 40 congregants, which creates an uncomfortable environment for congregants and encumbers the Chabad's religious services and functions.

49. During the Jewish High Holy Days, the Chabad has larger services with approximately 190 people attending.

50. Due to space constraints, the High Holiday services cannot be held indoors and are instead held outdoors in a tent. The tent is not conducive to services, creating an uncomfortable environment for congregants.

51. Due to having to meet outdoors in a tent because of space limitations, congregants attending the services are subjected to inclement weather such as rain which covers the premises with mud, creating an unpleasant, gloomy environment that affects the Chabad's services and discourages congregants.

52. Despite the Chabad's best efforts to provide an accommodating environment for services while outside, congregants are subjected to uncontrolled temperatures that impede the services and discomfort congregants.

53. The High Holy Day services are disrupted by outside noise from the cars and leaf blowers, preventing the congregants from hearing the Rabbi's sermon, the focal point of the service, and leading some congregants to go elsewhere for High Holy Day services.

54. These space limitations restrict the religious practices of the Chabad.

55. During Simchat Torah, a joyous Jewish holiday celebrating the reading of the Torah, Orthodox Jews march and dance with Torah scrolls around the Chabad.

56. However, due to the space limitation of the Chabad, its congregants cannot dance with the Torah properly in line with the celebration of Simchat Torah.

57. Other holidays such as Purim are not properly able to be celebrated at the Chabad.

58. Indeed, Purim should be a joyous holiday with food and celebration for the children.

59. However, the current space does not allow for Purim to be celebrated properly with entertainment for the children and adults.

60. The weekday and Sunday *minyanim* are conducted each morning and average approximately ten attendees, and the Shabbat services average 35 to 40 attendees.

61. In a Chabad, seating is separated by gender, to focus on prayer and spiritual flourishing without any distraction.

62. Due to the Chabad's space limitation, this separation has been difficult to maintain as the necessary separation requires more space and seats to accommodate this religious practice.

63. The current space impedes the ability to properly set up or adjust seating by gender in line with the Chabad's spiritual practice, particularly when a greater number of congregants of one gender attend, as planning seating patterns in accordance with the Chabad's religious practice is not possible until congregants show up to attend a service at the Chabad.

64. With the current space limitations, when the space used as a sanctuary is filled, the women overflow near the entrance past the separation, making the separation improper for the services.

65. The Chabad believes that it should provide a *mikvah*, a dedicated bath facility for ritual washing, for its congregation.

66. The Chabad does not have a *mikvah* in its current facility.

67. Upon information and belief, the nearest *mikvah* to the Chabad is located in Plainview, New York, approximately nine miles away.

68. If a congregant would need to go to the *mikvah* during the Sabbath, the congregant would have to walk to the nearest *mikvah*.

69. Another aspect of Judaism that is impeded by the current space limitation of the Chabad is the practice of a *kiddush*.

70. The Chabad is restricted to providing a very limited *kiddush* after its Shabbat service, causing some congregants to leave because they cannot be accommodated.

71. The Chabad cannot hold other religious events involving extensive food preparation because there is inadequate space in the kitchen.

72. Jewish Women's Circle is a Jewish women's group sponsored by the Chabad that provides an atmosphere for Jewish women to share Jewish experiences that "rejuvenate mind, body and soul."

73. Jewish Women's Circle is not able to meet consistently because of a lack of seating at the Chabad due to space limitations; instead, the group will sometimes have to move to congregants' houses to accommodate all members.

74. The Chabad provides its Hebrew School for children that includes various programs like CKids club, Aleph Champ, and First Taste Hebrew, all of which are integrated together, allowing children a comprehensive Jewish education.

75. The Chabad's children's programs under the Hebrew School are guided by its mission statement, which states the following:

> The mission of Chabad Hebrew School is to provide and promote the highest quality after-school Judaic education to a diverse community

> of Jewish children.
>
> Our aim is to nurture and build the foundation of your child(ren)'s Jewish identity through our interdisciplinary educational approach. The focus of our dedicated teachers is to inspire a two fold love. A love for learning and a love for Judaism while fostering a feeling of familiarity within their heritage for each individual child.
>
> A well-balanced Hebrew School education will develop in our students a commitment to using Torah values as a guide to the decisions of life, community, and life-long learning and teaching.

76. The children's programs, including the Hebrew School, average 30 attendees.

77. Due to the space limitations of the current Chabad barring large religious celebrations such as bar and bat mitzvahs due to the lack of space to hold a reception, parents have chosen not to enroll students in the Hebrew School, impeding the parents' desire to have a comprehensive Jewish education for their child.

78. The Chabad also offers programs for teenagers called CTeen to foster Jewish friendships and serve the community.

79. The CTeen group reaches out to the Upper Brookville, Village of Brookville, and surrounding areas during specific times of the year by making care packages for senior adult living facilities or hospitals.

80. The CTeen program meets monthly and averages about 20 to 25 teens.

81. Due to space limitations, the CTeen program does not have a dedicated space for the CTeen program to meet, inhibiting the youth group's ability to regularly gather and conduct services.

82. Several times a year, the Chabad holds a communal Friday night meal; however, because of the space limitations of the current Chabad, the Chabad cannot accommodate the number of congregants and individuals who try to attend this meal.

83. As a spiritual hub for the Upper Brookville, Village of Brookville, and the

surrounding areas' Jewish community, congregants and members of the Jewish community come to the Rabbi for counseling or advice in unscheduled, emergency situations.

84. Due to the space limitations, however, the Chabad currently lacks a private space for Rabbi Heber to counsel as spaces are used for other programs or for his family's private living space.

85. The Chabad currently lacks sufficient space for administrative facilities for the Plaintiffs.

86. Due to current space limitations, the area of the residence where services are held is difficult to access for individuals with disabilities; in particular, bathrooms are not fully accessible and the seating in the worship area is difficult to navigate for individuals with disabilities.

**The Property**

87. The Property is a two-acre lot containing a single-family residence.

88. The Property is located in the Residential 1 ("R1") zoning district of Upper Brookville.

89. The Property's location is marked by the red pin in the aerial photograph below:




90. The Property is bordered to the south by Cedar Swamp Road (New York State Route 107), a busy two-lane arterial road connecting, among other major roads, the Jericho Turnpike (New York State Route 25) to Northern Boulevard (New York State Route 25A).

91. There are commercial, institutional, governmental and residential uses surrounding the Property.

92. Adjacent to the Property is a British Petroleum gas station, which contains a service center, convenience store, and gasoline pumps.

93. Located to the northwest of the Property is the intersection of New York State Route 107 and New York State Route 25A, a busy multi-lane, signalized intersection approximately 275 feet from the Property immediately adjacent to the gas station.




94. On the northern side of Northern Boulevard (NYS Route 25A) is a shuttered gas station.

95. The Chabad is very near the Long Island University Post campus with approximately 16,600 students, located off Northern Boulevard.

96. Diagonally across the street, to the southwest, is the Greek Orthodox Church of the Holy Resurrection, a large church with accessory buildings including an athletic center, fellowship hall, and classrooms for its Greek School and Religious Education Program.

97. Approximately 1,600 feet to the west of the Property on Northern Boulevard adjacent to the Greek Orthodox Church of the Holy Resurrection is a sewage treatment plant.

**Applicable Land Use Regulations**

98. The use of the Property is subject to the laws and regulations of the Village of Upper Brookville and the State of New York.

99. Upper Brookville regulates land use in its jurisdiction in part through Chapter 205 of the Upper Brookville Village Code ("Village Code").

100. The Village Code sections described herein are "land use regulations" within the meaning of 42 U.S.C. § 2000cc-5(5).

101. The Village has only two zoning districts: Residence R1 Districts and Suburban Estate OP1 Districts ("OP1").

102. Places of worship are not permitted as of right in either of the two zoning districts.

103. Village Code Article III Section 205-8(A)(3)(c) provides that churches are permitted as conditional uses in both the R1 and OP1 zoning districts.

104. Village Code Article IV Section 205-20(C) sets forth specific requirements in connection with churches as follows:

> a. Church. The buildings and property of such church shall be used only for purposes of divine worship and other church purposes, and the membership of such church shall be at least partially composed of Village residents. Such church shall occupy a site of at least <u>six acres</u>.

(Emphasis added.)

105. General requirements applicable to all conditional uses are set forth in Village Code Section 205-21.

106. Village Code Article IV Section 205-10(D)(3) provides that "[i]n the R1 (two-acre) District no detached single accessory building, except for those without a roof and walls, shall have a floor area which exceeds 1,000 square feet. The combined floor area of all such accessory buildings or structures on a lot shall not exceed 1,600 square feet."

107. A number of other Village Code provisions regulate if and how a property can be used as a church, including regulations concerning setbacks, parking, building volume, building coverage, and accessory structures.

108. A conditional use in New York State is considered to be a permitted use under the zoning code under certain conditions.

**Building Application**

109. The Chabad filed a building permit application for a new Chabad and parking layout to accommodate the religious exercise of its existing congregation with the then-Upper Brookville building inspector, Matthew Moed ("Moed") in early 2015.

110. In the ten years since this first application was filed, the Chabad has been subjected to a pattern of delays, departures from ordinary procedures, repeated objections by the Defendants to items that were either previously addressed or which are not proper objections under the Village Code and laws, hostile public comments and Village responsiveness to the same, repeated revisions by the Chabad to innumerable changes requested by the Village, repetitive requests for documents and studies, the Village's ignoring of deadlines under the Village Code and under State law for issuing decisions, and interference by the neighboring Village of Brookville and the Village's responsiveness to the same.

111. During the ten-year process to date seeking to build a synagogue on the Property, the Chabad has been required to submit *twenty-three* different versions of the site plan.

112. The Village's actions have forced the Chabad to incur more than $400,000 in fees for its attorneys and other professionals.

113. The 2015 building permit application was for approval to build a 5,269-square foot synagogue on the Property for the existing congregation of the Chabad.

114. The Chabad's existing congregation in 2015 totaled approximately 100 families who live either within Upper Brookville or in close proximity to the Village, and remains approximately the same to this date.

115. The main floor of the synagogue will contain a sanctuary for worship, an open seating area for *kiddush* services along with a kitchen, bathrooms, and an office for the Rabbi.

116. A mezzanine will provide a library and space for adult religious education.

117. The lower level of the synagogue will contain a multi-purpose room, office, classrooms, and a room for a ritual bath, or *mikvah*.

118. The Upper Brookville Building Inspector issued a "Notice of Disapproval" dated August 17, 2015, denying the 2015 building permit application for three "violations," indicating the Chabad would need to seek approval for a conditional use and a variance related to the floor area of the detached single accessory building before the BZA, a site plan from the Planning Board, and approval from the New York State Department of Transportation ("NYSDOT") relating to traffic plans for New York State Route 107.

119. The number of "violations" (and required variances from the same) continued to rise through the Chabad's ordeal with the Village.

120. On September 17, 2015, the Upper Brookville building inspector revised the denial of the application to require that the Chabad also seek variance relief relating to the six-acre minimum lot area requirement of the Village's zoning code for "Church[es]," described below.

121. The Chabad submitted its application dated December 10, 2015 for a conditional use permit with a Full Environmental Assessment Form ("EAF") pursuant to New York's State Environmental Quality Review Act ("SEQRA") and site plan drawings (version 1[1]) dated

---

[1] As described herein, the Chabad was ultimately required to have its engineers draft approximately *twenty-three* versions of the site plan for its synagogue. The Chabad revised its original site plan many times in response to the requests of the Defendants or other governmental authorities in a futile effort to be cooperative and have its application reviewed in a timely manner. Each revision is noted in parentheses.

December 29, 2015, which were received by the BZA on January 27, 2016.

122. Under New York Village Law, the BZA is required to decide an application for a conditional use permit and variance relief within 62 days of the hearing on the application.

123. In an application also dated December 10, 2015, the Chabad filed for variance relief from Village Code Article VI Section 205-10-D(3), related to floor area that exceeds 1,000 square feet for the detached accessory building; Village Code Article VI Section 205-20(C), related to the six-acre minimum required for a "Church"; and for conditional use approval pursuant to Village Code Article II Section 205-8(A)(3)c.

124. The Chabad submitted a "Rider" with its variance application detailing its compliance with Village Code § 7-712-b, which outlines a zoning board of appeals' process for determining whether to grant a variance, as follows:

> The Applicant proposes to build a 5,269 square foot building as accessory to the existing home to be used for divine worship for the Chabad congregation and for related religious education.
>
> The granting of the requested variance will not produce an undesirable change in the character of the neighborhood or create a detriment to nearby properties. The residential character will remain on the residential parcel while accommodating religious practices in the community. There is another religious building on the very same street. The site is adequate to accommodate the proposed building and related parking while maintaining the required setbacks.
>
> The benefit sought by the Applicant cannot be achieved by some method feasible for the Applicant to pursue other than by obtaining these variances. The granting of the variance will allow the clergy to live in his home with his family located on the same property with the building where the congregants will practice their religion.
>
> The benefit sought by the Applicant cannot feasibly be obtained without the requested variance. The requested variance is not substantial in the context of this appeal, nor would the variance result in a proposed improvement that is out of character for the area. The property can adequately accommodate the proposed building.
>
> The requested variance will not result in any known or

> contemplated adverse effect or impact on the physical or environmental conditions in the surrounding neighborhood or district.
>
> The alleged difficulty was not self-created as it fulfills a religious mission and serves to accommodate the clergy to live on the site while providing a facility for religious worship and education.

125. With respect to the six-acre minimum lot size requirement, the Chabad noted that the proposed building was "in keeping with the size of homes in the area" and reiterated that there would not be an "undesirable change in the character of the neighborhood," nor would there be any "other feasible method for obtaining this benefit and the alleged difficulty was not self-created. "

126. Additionally, the Chabad explained how its application for a conditional use comported with the requirements of Sections 205-8, 205-18, and 205-20 of the Village Code as follows:

> The Applicant is seeking a conditional use to maintain a synagogue as a community facility. The buildings and property will be used only for purposes of divine worship and other synagogue related purposes. The membership of Chabad is mostly composed of Village residents. The Applicant will further seek a variance of the six acre requirement. The two acre site is adequate to provide parking and build the accessory building as a house of worship for a small congregation.
>
> As much of the site will be preserved as possible with additional landscape buffering provided. Additionally, the use will be of such location, size and character that it will be in harmony with the surrounding properties. The design and site layout will not interfere with the appropriate and orderly development of the residential district in which it is situated. The proposed religious use will not be detrimental to the adjacent properties.

127. Village Code Article III, Section 205-8 requires that an applicant seeking a conditional use certificate write an application to the BZA, which may approve a conditional use certificate "subject to conditions as said Board may impose."

128. As part of its review, the BZA must refer the application and plans to the Village

of Upper Brookville Planning Board ("Planning Board") for review, as detailed in Village Code Article VI Section 205-21.[2]

129. Village Code Article VI Section 205-21(A)(2)(a) provides that the Planning Board shall issue a favorable or unfavorable report to the BZA on an application for conditional use "within 90 days after the receipt by the Planning Board."

130. The Chabad's then-counsel sent a letter dated February 22, 2016 to the BZA clarifying that as a result of the relief being sought, the existing building on the Property, the Rabbi's home, would become the accessory use to the Chabad's synagogue, and therefore the variance under 205-10-D(3) and the conditional use application under Village Code Section 205-8 both apply to the new building's use as a principal use.

131. In a letter dated February 26, 2016, the Nassau County Department of Public Works Planning Commission issued a letter to Upper Brookville, informing Upper Brookville that it had voted to allow the Village to make its determination on the application because the County had no modifications it wanted to make to the project, other than the Chabad and Upper Brookville cooperating on finding a suitable pervious surface for parking.

132. For over a year, from April 2016 to May 2017, the Village held hearings on the application, during which numerous extraneous issues about the Chabad not relevant to the application were raised by the Village. Village residents expressed hostile comments toward the Chabad during hearings, and the neighboring Village of Brookville inserted itself into the process to oppose the Chabad and express hostility to the Chabad, despite that village's support for and approval of a large Christian church immediately across the street from the Chabad. During this

[2] As detailed further below, the Chabad's application was referred to the Planning Board by the BZA during the May 23, 2017 "dual hearing," where the application was heard before both the Town's BZA and Planning Board.

period, the Chabad made numerous changes to the plan to respond to concerns expressed by the Village.

133. On March 15, 2016, the Chabad submitted a revised plan (version 2) for the BZA's review.

134. The Planning Board scheduled the first hearing on the application for April 13, 2016.

135. During the April 13, 2016 hearing, consideration of the Chabad's application was postponed by the Planning Board until a later meeting.

136. After postponing the application and adjourning the meeting, the Planning Board still allowed public comment and Planning Board questions on the plan.

137. The Planning Board permitted multiple people, both residents of Upper Brookville and non-residents, including the Deputy Mayor of the neighboring Village of Brookville, to comment on the Chabad's plan, after already adjourning.

138. The public comment allowed after the adjournment included the following comments demonstrating hostility toward the Chabad:

a. "I think [the Chabad] will devalue the property, you know, substantially. And we are very much against. That's one thing. And I think that public people coming in to [the Chabad's] property have to be worried about the security of anybody coming in there and jumping over the fence."

b. "There's a lot of people there [at the Chabad]. They have bullhorns. There's a lot of commotion. It's not fair."

c. "I came late, so I don't know if you went through this, but there is a subbasement which has the a [sic] mikveh. It's a ritual bath that woman [sic] go to monthly. So that also is going to bring in plenty of more women."

139. Additionally, after the application had been adjourned by vote, Planning Board

members continued to question the Chabad about its events and details about the Chabad's membership.

140. On December 5, 2016 the Chabad submitted a revised site plan (version 3) dated June 10, 2016, which eliminated a sub-level floor, redesigned a gym into a *mikvah* and restrooms, and added a library and mezzanine to better facilitate adult religious education.

141. As part of the December 5, 2016 submission and in order to refute unsubstantiated assertions that the Chabad will negatively affect traffic on New York State Route 107, the Chabad submitted a traffic report written by VHB Engineering, Surveying and Landscape Architecture, P.C. to Upper Brookville officials dated November 29, 2016.

142. The VHB traffic report found no "unusual traffic flow patterns or disruptions associated with the Chabad weekly or high holiday activities," nor did the report find "any significant accident patterns near the site, and it is not expected to change as a result of the proposed project."

143. Additionally, in compliance with demands made of the Chabad at the April 13, 2016 Planning Board meeting, the Chabad submitted the Chabad's schedule of events.

144. On March 2, 2017, the BZA reviewed the application and EAF and determined that the application would be designated an "Unlisted Action," pursuant to SEQRA, Compilation of Codes, Rules and Regulations of the State of New York Title 6, Section 617.4, which "is to identify, for agencies, project sponsors and the public, those actions and projects that are more likely to require the preparation of an EIS [Environmental Impact Statement] than Unlisted actions."

145. On May 23, 2017, the BZA and Planning Board conducted a dual hearing on the application.

146. During this meeting, the BZA designated itself as the "lead agency in connection with the environmental review of the application of the Chabad" pursuant to SEQRA.

147. Under SEQRA, the lead agency must make a "determination of significance" within 20 calendar days of receipt of information it reasonably needs. Such a determination would either be a "negative declaration," determining that the proposed action will not have a significant adverse environmental impact, or a "positive declaration," that the action will have a significant adverse impact on the environment.

148. Such determination was not made by the BZA until October 30, 2024.

149. Although the Planning and Zoning Boards were only to consider the limited issues raised by the application, which were for variance relief from Village Code Article VI Section 205-10-D(3) (related to floor area for the detached accessory building), Village Code Article VI Section 205-20-C (related to the six-acre minimum lot area required for a "Church"), for conditional use approval pursuant to Village Code Article II Section 205-8(3)(c), Article IV Section 205-10-D(1)(a) (relating to the cubic volume of all buildings), and for Article IV Section 205-10-E (relating to front yard setback), the Boards improperly engaged in questioning on other extraneous issues including parking and traffic, for which the requirements were met by the Chabad and for which no variance was sought.

150. Throughout the Chabad's application process and subsequent revisions in response to Upper Brookville's and the NYSDOT's comments, the Chabad ensured that its parking plan complied with Village Code's off-street parking requirements for a "Church" found in Article V Section 205-16(B).

151. Although the Chabad's parking plan met the Village Code's requirements, the Board members questioned these plans, despite the Chabad reiterating to the Boards that a

parking variance was not required.

152. The Chabad noted that the Chabad's plan (version 3) met Upper Brookville's parking requirement under the one parking spot to four seats ratio, with 49 spots for 196 occupants.

153. As to the six-acre minimum lot size requirement, a real estate expert testified on behalf of the Chabad at the hearing that, based upon his knowledge of and research on the area surrounding the Chabad and similar communities surrounding other Chabads, the Chabad's proposed new building would not affect the character or value of the immediate vicinity because the immediate vicinity of the Chabad is "substantially developed" and "religious institutions do not negatively affect the character of the neighborhood or property values."

154. New York State Route 107 was and is subject to the jurisdiction of the NYSDOT, not Upper Brookville, requiring the Chabad's traffic plans, entrances to the Property, and any work from the Property's boundary line with New York State Route 107 to be approved by the NYSDOT.

155. Despite New York State Route 107 being under the jurisdiction of NYSDOT, the Board members extensively questioned the Chabad regarding the Chabad's traffic plans.

156. Throughout the May 23, 2017 hearing, the Chabad's traffic expert testified to the safety and reasonability of the Chabad's traffic plan, testifying that traffic levels would remain the same since the Chabad already operates on the Property, over the past three years only one accident had occurred in the vicinity of the Chabad during the Chabad's operating hours, and that the Chabad would comply with "whatever" the NYSDOT required regarding traffic.

157. The neighboring Village of Brookville also repeatedly inserted itself into the Chabad's dealings with Upper Brookville and the NYSDOT in an effort to block the approval of

the Chabad's permits and applications for conditional use and variances.

158. The Village of Brookville's actions were motivated by hostility toward the Chabad, treating it differently and worse than a much more significant application of a Christian church within its own jurisdiction and immediately across the street from the Chabad.

159. The Village of Upper Brookville was responsive to the Village of Brookville's objections to the Chabad.

160. During the May 23, 2017 hearing, the attorney for the neighboring Village of Brookville negatively commented on the Chabad's plans.

161. At the end of its portion of the hearing, the BZA formally referred the application to the Planning Board.

162. Toward the conclusion of the Planning Board's hearing on the Application on May 23, 2017, the Planning Board demanded that the following additional substantial information be submitted by the Chabad for the Planning Board's review:

> Submit an amended full environmental assessment form and revised site plan which shall include topographical contour lines, details for both entrances on Route 107, landscaping plans, parking lot details with numbered spaces, proposed tree removal, New York State Department of Transportation approval for driveways, entrances, screening detail, lighting plan, signage, evidence that Nassau County Department of Health will give approval to the proposed sanitary system and any other technical information requested by the village engineer.

163. Another Planning Board member proposed an additional demand for a drainage plan from the Chabad be added to the Chairman's list, which the Planning Board then included.

164. In furtherance of this request by the Planning Board, the Chabad began to gather and prepare the additional specifications for the BZA's demands.

165. Despite the Chabad's responsiveness to the Planning Board's demands, the Planning Board failed to produce a report to the BZA within 90 days as required by Village Code

Article VI, Section 205-21(A)(2)(a).

166. The 90 day period expired on August 21, 2017.

167. The Chabad revised its plan (version 4) dated September 6, 2017 pursuant to the May 23, 2017 hearing comments, and provided it to NYSDOT.

168. From the close of the May 23, 2017 hearing to more than two years thereafter, the Chabad began the arduous process of obtaining approvals from the NYSDOT and Nassau County Health Department and submitting the approvals to the Village and its consultants for review.

169. The NYSDOT issued its comments on the Chabad's site plan (version 4) on January 3, 2018 and January 23, 2018.

170. The Chabad incorporated these changes from the NYSDOT into site plans (versions 5 and 6) dated January 8 and 24, 2018.

171. On March 15, 2018, NYSDOT granted the State's approval of the Chabad's site plan (version 6).

172. The Chabad further incorporated suggested changes from its engineer's meeting with the Upper Brookville Engineer into a subsequent site plan (version 7) dated May 15, 2018.

173. The Chabad created a revised site plan (version 8) dated September 14, 2018.

174. In response to a March 21, 2019 letter from the Nassau County Health Department requesting site plan edits, the Chabad issued a revised site plan (version 9) dated March 26, 2019 incorporating the Nassau County Health Department's requests.

175. On May 9, 2019, the Nassau County Health Department granted a "Certificate of Approval for the Construction or Modification of an On-Site Sanitary System Serving Commercial & Institutional Facilities," approving the Chabad's proposed building's installation

of a new on-site sanitary sewer system.

176. The Chabad incorporated the Nassau County Health Department's specifications on a revised site plan (version 10) dated June 14, 2019, which was submitted on June 27, 2019 to the Planning Board along with a revised EAF (version 2[3]).

177. After the grant of NYSDOT approval and Nassau County Health Department approval, the Village continued to delay the application by raising, in letters and in hearings, issues that had previously been submitted to the Village and addressed at hearings, issues that had been addressed by NYSDOT and the Nassau County Health Department, new requirements and conditions that could have been raised earlier but were not, and failure of the Planning Board to provide a report to the Board of Zoning Appeal within 90 days of a hearing as required by the Village Code.

178. Upper Brookville's planning/environmental consultant James Antonelli ("Antonelli") issued a letter dated September 9, 2019 beginning his SEQRA review of the application and the revised EAF (version 2).

179. The September 9, 2019 letter included Antonelli's comments to the BZA and Planning Board, which included comments on issues already addressed and approved by the NYSDOT and Nassau and County Health Department such as traffic studies and information regarding the Chabad's location within the special water district, which both, as described above, granted their approval to the Chabad's plan on March 15, 2018 and May 9, 2019, respectively.

180. More than two years later, on September 12, 2019, the BZA and Planning Board held a joint hearing as a continuation of the May 23, 2017 hearing on the Chabad's application.

181. As of the September 12, 2019 hearing, the Planning Board had still failed to

[3] As with the site plan, the Chabad revised its original EAF several times for the same purpose.

produce its required report to the BZA.

182. As previously noted in the May 23, 2017 hearing, the Chabad reiterated that its parking plan met the Village Code's parking requirement, and that no variance was required for this issue.

183. The Chabad's architect testified before both Boards during the hearing, explaining that the plan was designed to improve traffic flow on Cedar Swamp Road by the Chabad's congregants, provide appropriate spaces for religious education and practice, and conform to the aesthetics of the surrounding area.

184. The Chabad agreed to limit the occupancy of the building to the "stated posted occupancy" of 196 attendees, in accordance with Nassau County's approval of the sanitary system for the proposed building as well as parking requirements.

185. The maximum number of attendees expected in the religious building would only be 175 to 190 attendees during the Jewish High Holy Days, below the 196 seats in the Chabad's plan.

186. In response to Board member concerns, the Chabad agreed to the following further conditions during the September 12, 2019 hearing:

a. a condition restricting the existing residence to be used solely as a residence,

b. a condition that the new building would not be a venue for parties,

c. a condition that traffic directors or security would be contracted for events that would maximize the building's occupancy,

d. and a condition that outdoor parking lot lighting would be extinguished at night whenever the building was not in use with the exception of low level security lighting.

187. The Chabad was also responsive to Antonelli's September 9, 2019 letter regarding SEQRA review, submitting the following: a report entitled "Supplemental Information for the

EAF," dated November 11, 2019; a revised EAF (version 3) dated November 13, 2019; and an updated traffic report dated December 9, 2019, concluding again that there have not been "any significant accident patterns" near the Chabad, nor would the new building increase traffic.

188. On January 27, 2020, Antonelli sent another letter to the BZA and Planning Board, now listing *nineteen* additional comments for the Chabad to address, including duplicative demands for additional traffic studies by the Chabad, and demands to include minor details such as indicating that "air emissions" may exist during construction and operation of the Chabad.

189. Despite the duplicative and minute nature of several of the demands in Antonelli's January 27, 2020 comments, the Chabad submitted a letter dated May 22, 2020 responding to his comments as well as attaching a new EAF (version 4) and Supplemental EAF report.

190. Further in response to Antonelli's January 27, 2020 comments, on October 23, 2020, the Chabad submitted EAF (version 5) with Antonelli's requested revisions, a response letter to Upper Brookville and site plan (version 11) to Upper Brookville.

191. In a letter dated December 2, 2020, Antonelli wrote to the Planning Board and the BZA regarding the Chabad's October 23, 2020 submission, with *eleven additional comments* for the Chabad that demanded several unnecessary revisions from the Chabad, such as information pertaining to the dimensions of the existing building "in the narrative" to be responsive to public hostility toward the Chabad at the hearings as well as a comparison of mitigation measures for the loss of trees, which Antonelli characterized as additions that would be "helpful."

192. During the period from the end of 2020 to 2024, no additional hearings were conducted by the Boards on the application. During this period, the Chabad was subjected to continued delays due to further requests for revisions from the Village's engineer and consultant

covering a range of minor issues, requests for *additional* traffic studies despite this being within the purview of the state NYSDOT, and due to Upper Brookville's deference to the objections of the neighboring Village of Brookville.

193. On February 18, 2021, the approval of the Chabad's highway work permit and related plans by the NYSDOT were required to be updated and gain *reapproval* by the NYSDOT due to their expiration after delays by the Village leading to the NYSDOT issuing additional requirements for approval.

194. As a result, the Chabad had to re-submit an application to NYSDOT dated March 24, 2021 and site plan (version 12) dated March 1, 2021 to gain approval again for a highway work permit.

195. On March 11, 2021, the Chabad submitted another EAF (version 6) and supplement dated March 10, 2021, addressing Upper Brookville's previous comments, and requesting approval of the Chabad's plans.

196. In addition to the above-mentioned site plan (version 12) and EAF (version 6), the Chabad submitted letters in response to the Upper Brookville Engineer's December 3, 2020 letter and Antonelli's December 2, 2020 letter.

197. The Upper Brookville Engineer issued yet another letter dated March 31, 2021, giving additional comment on the Chabad's lighting system and the NYSDOT permit plan, despite the Chabad's March 10, 2021 responses to the Upper Brookville Engineer's previous letter dated December 3, 2020 already addressing both issues.

198. Additionally, Antonelli sent another letter to the Boards dated April 1, 2021 regarding the Chabad's application, acknowledging that the vast majority of his comments had been addressed by the Chabad in the March 10, 2021 submissions but again repeating demands

for additional traffic studies.

199. On May 6, 2021, the Chabad submitted response letters to Antonelli's April 1, 2021 and the Upper Brookville Engineer's March 31, 2021 comments.

200. On the same date, the Chabad submitted a revised site plan (version 13) dated April 7, 2021, addressing the Upper Brookville Engineer's and Antonelli's comments and incorporating them.

201. Antonelli sent a letter dated September 16, 2021 to the BZA, further delaying determination of the Chabad's application by purporting that, despite all of the revisions, information provided, and responses to Village inquiries, there was still not enough detail to determine significance under SEQRA.

202. Antonelli also included a recommendation that the BZA wait to conclude its review until it could review the neighboring Village of Brookville's consultant's forthcoming report.

203. Because the BZA would not approve the application, complete the SEQRA review, or issue any stipulated decision on the Chabad's site plan (version 13) dated April 7, 2021 without the new NYSDOT permit, the Chabad decided not to proceed with the scheduled September 23, 2021 hearing to reduce any duplicative efforts and costs arising from the BZA's inaction.

204. On September 23, 2021, the Chabad, in response to May 12, 2021 NYSDOT email comments, submitted another site plan (version 14) and letter dated September 20, 2021 to NYSDOT.

205. On November 16, 2021, the NYSDOT sent a letter with additional comments to the Chabad, mistakenly listing the address of the Chabad as in the Village of Brookville and

copying only the Village of Brookville on the letter.

206. On November 19, 2021, Upper Brookville sent a letter to NYSDOT stating that the Chabad is in Upper Brookville, as requested by the NYSDOT, after the NYSDOT mistakenly copied officials from the Village of Brookville in its response to the Chabad rather than officials of Upper Brookville.

207. In further response to the NYSDOT comments, on December 3, 2021, the Chabad sent the NYSDOT a letter and site plan (version 15) dated December 3, 2021.

208. Despite prior approval of the site plan (version 5) by the NYSDOT in March 2018, on December 17, 2021, the firm of Kimley-Horn Engineering and Landscape Architecture of New York, P.C., on behalf of the Village of Brookville, issued a letter ("the Kimley-Horn letter") directly to NYSDOT in an effort to prevent NYSDOT from re-approving the Chabad's application.

209. Upon information and belief, the Village of Upper Brookville sent the Village of Brookville the Chabad's traffic report and other materials that the Chabad had submitted to the Village of Upper Brookville.

210. Subsequently, upon information and belief, NYSDOT–being under the impression that the Kimley-Horn letter was commissioned by the jurisdiction in which the Chabad was located–contacted the Chabad in January 2022, and notified it that NYSDOT would not issue its reapproval of Chabad's application without a written statement from Upper Brookville notifying NYSDOT that the Village of Brookville does not have jurisdiction to either approve or deny Chabad's application.

211. In January 2022, the Chabad's counsel requested clarification from the BZA.

212. Upper Brookville's attorney responded January 28, 2022 by email directing the

Chabad to the November 19, 2021 letter.

213. The Chabad attempted to contact Upper Brookville's attorney via telephone several times in February 2022 to request that the attorney provide the necessary updated written clarification to NYSDOT, but the calls went unreturned.

214. On April 4, 2022, the Chabad sent Upper Brookville a letter to "urge [Upper Brookville] to issue a clarification letter to the Department of Transportation, deem its SEQRA review complete, and promptly approve Chabad's Application" to finally ameliorate the BZA's failure to act on Chabad's application, which at the time of the instant letter, had been pending before the Boards for well over six years.

215. The Chabad sent a follow-up letter to Upper Brookville, dated April 14, 2022, requesting that Upper Brookville re-send a letter to NYSDOT clarifying Upper Brookville's jurisdiction over the Chabad to avoid any further burdensome delay to the Chabad.

216. On April 25, 2022, approximately seven months after the Kimley-Horn letter was sent on behalf of the Village of Brookville to NYSDOT, Upper Brookville's attorney finally sent a letter to NYSDOT clarifying that the Chabad is within Upper Brookville and not the Village of Brookville.

217. On May 5, 2022, NYSDOT preliminarily approved the Chabad's highway work permit pending the submission of another application, procedural paperwork, and fees.

218. On June 8, 2022, the Chabad submitted its fees, insurance, bond, and a site plan to the NYSDOT, fulfilling the NYSDOT's May 5, 2022 request.

219. Despite the effort by the Chabad to clarify the situation regarding Upper Brookville's jurisdiction, on May 25, 2022 the NYSDOT requested that the Chabad respond to the *Village of Brookville's* concerns and shared the December 2021 Kimley-Horn letter with the

Chabad.

220. Later that day, the Chabad attempted to again clarify that Upper Brookville had jurisdiction over the Chabad, not the Village of Brookville.

221. Still, on June 14, 2022, the NYSDOT reiterated that it was still requiring the Chabad to address the Village of Brookville's concerns.

222. On July 5, 2022, the Chabad responded to the Village of Brookville's concerns by email, complying with the NYSDOT's demands.

223. Despite the Chabad's responsiveness to the neighboring Village of Brookville's concerns, on July 13, 2022, the Village of Brookville responded by claiming neither the NYSDOT nor the Chabad was responsive.

224. To further respond to the Village of Brookville's baseless claims of nonresponsiveness by the Chabad, the Chabad responded by email on July 18, 2022 to the Village of Brookville and NYSDOT including, in part, the following:

a. "You had mentioned increase in vehicle traffic in your below email. The Traffic letter provided by John Canning, does not list any supporting data outside of the opinion/ assumptions. We are working to provide true data."

b. "Attached please find an ITE [Institute of Transportation Engineers] trip generation. THE NYSDOT requires that any sites which generates over a 100 trips one way provide a TIS (Traffic Impact Study). The data here shows that at a peak hour (with the number seats provided), we would generate 40-50 cars one way at the peak. Well below the requirement set for the NYSDOT."

c. "You mentioned the painted median in your response. Technically any cars idling on the median would or using it as a left turn would be an illegal

movement."

d. "Lastly, I would like to mention that the peak times for the Chabad will not be at the same time of peak traffic hours. Based on other studies, Saturday afternoon typically would be the peak for the Chabad. Those hours would not conflict with your typical peak traffic hours."

225. Even though the Chabad had responded to the neighboring Village of Brookville's concerns (despite that Village's lack of jurisdiction over the Chabad or New York State Route 107), on August 3, 2022 the NYSDOT said it would not issue any approval until the Chabad addressed the Village of Brookville's concerns.

226. Upon the demand by the NYSDOT that the Chabad must respond to the neighboring Village of Brookville, the Chabad began to gather and prepare materials to fulfill the NYSDOT demands.

227. On December 7, 2022, the Chabad submitted a December 5, 2022 traffic analysis along with a site plan (version 16) dated November 29, 2022 to the NYSDOT, in order to respond to the Kimley-Horn letter and the Village of Brookville's concerns.

228. On January 19, 2023, the Chabad revised its site plan (version 17) increasing the size of the Chabad from 5,293 to 6,421 square feet with a 372 square-feet canopy, a cover over the outside entrance to shield congregants from the weather, to provide more space for congregants for worship similar to other synagogues and Chabads, without increasing the number of seats or the planned capacity.

229. In response to a NYSDOT comment letter dated April 22, 2023, the Chabad submitted a response letter dated April 25, 2023, a traffic analysis dated April 25, 2023, and site plan (version 18) dated April 21, 2023 to the NYSDOT on April 26, 2023.

230. Finally, on May 19, 2023, the NYSDOT concluded that the Village of Brookville's concerns had been addressed by the Chabad.

231. On May 24, 2023, NYSDOT approved a highway work permit based upon the Chabad's plan (version 18) dated April 21, 2023.

232. With the NYSDOT's approval, the Chabad submitted its site plan (version 18) dated April 21, 2023 to Upper Brookville on or about August 21, 2023.

233. Despite the NYSDOT's approval following an extensive approval process during which the Chabad was responsive to both NYSDOT, the Village of Upper Brookville, and the Village of Brookville's comments, the Village of Upper Brookville continued to issue demands for information from the Chabad pertaining to minor and previously addressed issues, further delaying the Chabad's application.

234. On October 2, 2023, the Village of Upper Brookville demanded that the Chabad provide it with copies of all correspondence with the NYSDOT, which the Chabad provided within the same week.

235. In a letter dated October 19, 2023, Antonelli made five additional comments on the Chabad's plan (version 18) dated April 21, 2023 to be addressed by the Chabad including the following: a new EAF submission, an adjustment to the scale of the landscaping in the site plan, new additions to the traffic study, and *another* response to the Village of Brookville's Kimley-Horn Letter regarding traffic, even though the NYSDOT had approved the Chabad's traffic plan and work permit approximately six months prior.

236. In a letter dated October 23, 2023, the BZA's engineer offered four additional comments on the Chabad's plan (version 18) dated April 21, 2023 to be addressed by the Chabad which included demands for minor changes regarding clearer labels for two parking spaces and

the proposed sidewalk.

237. In a letter dated November 6, 2023, the Chabad's traffic engineer responded to the October 19, 2023 review letter from Antonelli addressing his traffic concerns.

238. The neighboring Village of Brookville submitted an additional letter dated November 20, 2023 to Upper Brookville again intervening in the Chabad's application and objecting to the Chabad's traffic report and plans, which had already been approved by the NYSDOT.

239. On January 8, 2024, the Chabad responded to Antonelli's October 19, 2023 request and the BZA engineer's October 23, 2023 request with response letters dated January 5, 2024, a EAF (version 7) dated January 8, 2024, an EAF supplement dated January 5, 2024, a revised traffic impact analysis dated January 3, 2024, a boundary and topographic survey dated December 20, 2023 and plan (version 19) dated December 20, 2023.

240. On January 10, 2024, the Chabad sent a letter to the BZA addressing the BZA's continued delay of the Chabad's plans as being unjustified under RLUIPA.

241. On January 12, 2024, the new Upper Brookville building inspector, Sergio Tedesco ("Tedesco") wrote a letter to Plaintiff Rabbi Heber, requesting yet more additional information about the revised site plan dated December 20, 2023.

242. In addition to 16 other requirements, Tedesco demanded that in order for the December 20, 2023 site plan (version 19) to be approved, that 81 parking spaces be provided for the Chabad.

243. In a substantial deviation from procedure and from previous hearings before the Boards, Tedesco calculated the parking requirements for the new building not by using Article V, Section 205-16(B) of the Village of Upper Brookville Code, which calculates parking for a

"Church" at 1 parking space for every 4 seats, but by referring to the maximum occupancy under New York State law and then calculating the parking requirements by the sum of the sanctuary seating plus seating for other spaces in the building computed separately while incorrectly assuming that every use is at maximum capacity.

244. There is no basis in the Village Code for this parking calculation and determination, and it is contrary to law.

245. Due to the significant and substantial comments received on an ongoing basis from the BZA's and Upper Brookville professionals, officials, and employees over a course of almost ten years, on January 31, 2024, Chabad's counsel sent a letter to Tedesco requesting that all comments and information needed from the Chabad be requested at that time.

246. Furthermore, the Chabad noted that the January 12, 2024 letter requests information regarding the building occupancy and parking already discussed and addressed by the Chabad at the September 12, 2019 joint hearing, needlessly further delaying the Chabad's application.

247. The Chabad noted that Section 205-16(B) of the Village Code is the standard for determining parking for a "Church" in Upper Brookville, which the Chabad had been consistently using throughout the application process.

248. On February 22, 2024, Tedesco responded by email to the Chabad's January 31, 2024 letter stating:

> With respect to the completeness of the last review the village has issued, we feel we have done a very thorough review. As far as additional comments is concerned, that will depend on the comprehensiveness of the responses we receive. Its not uncommon that responses generate additional questions/comments or simply fail to answer the necessary questions being asked.
>
> Additionally with regards to maximum occupancy, this is

> calculated based on chapter 10 of the building code of NY State and not based on a stated number by the design professional. Therefore, the parking calculation will be reflected accordingly. If the applicant is stating that the uses will not be served concurrently, this is a matter for the Board of Appeals.
>
> Lastly, I will reserve any comment on the timing of this application to the village attorney who is cc'd on this email.

249. On March 7, 2024, the Chabad responded to Tedesco's January 12, 2024 letter including plan (version 20) dated January 26, 2024 incorporating Tedesco's comments.

250. Approximately nine years after the original denial, on April 25, 2024, Tedesco, while the application was pending before the Boards, and purporting to deny a building permit for the January 26, 2024 site plan (version 20), identified *twenty-six* (26) items that he asserted require a variance, including a variance for a decades-old air conditioning unit and variances premised on factual errors regarding the distance to the existing pool and pool equipment from the property line, which had been issued certificates of occupancy.

251. On June 24, 2024, the Chabad responded to each of the 26 items and provided certificates of occupancy and Compliance for the existing residence on the Property, both dated October 25, 2002, along with another site plan (version 21) dated June 21, 2024 addressing Upper Brookville's concerns in Tedesco's denial.

252. On July 11, 2024, Tedesco emailed the Chabad with three additional items; the distance to existing pool equipment from the rear property line, which he had already decided needed a variance in error; the distance to a proposed new cellar entry to the proposed synagogue from the rear property line; and the total flat roof area, stating that he needed clarification on these before he could finalize the denial.

253. On July 16, 2024, in an effort to accommodate Tedesco's July 11, 2024 requests, the Chabad submitted responses and a revised site plan (version 22) dated July 15, 2024 to Upper

Brookville.

254. On July 23, 2024, Tedesco demanded more information so he could finalize his denial.

255. On July 31, 2024, the Chabad responded to Tedesco's comments, submitting a response letter and plan (version 23) dated July 31, 2024 to Upper Brookville.

256. Tedesco issued another denial of a building permit letter dated August 6, 2024 for the Chabad's plan (version 23) dated July 31, 2024, including 22 variances the Chabad allegedly needed.

257. The denial claimed that several variances were needed for *existing* conditions, such as setbacks for the existing swimming pool and an existing air conditioning unit; however, the Chabad already had certificates of occupancy for the existing house on the property and for the pool, and the remaining conditions did not pose a negative impact necessitating variance relief.

258. The denial improperly required variances such as a variance for a rear ramp that in fact had already been removed from the plan and variances which were envisioned by the Village Code for a residential, single-family use of a property, not envisioned for the religious use of the Chabad.

259. The building permit denial by Tedesco was arbitrary, capricious, and contrary to New York State law.

260. The Chabad indicated its willingness to work with the BZA to mitigate any necessary variances.

261. The remaining variances that the Chabad actually needed were the acreage variance for a house of worship and either technical variances such as the bulk variances

regarding the existing residence becoming the accessory use, variances that naturally flow from a religious use in a residential neighborhood such as allowing the existing residence to remain as a clergy residence for the Rabbi as an accessory dwelling, variances needed to create space for parking, or the curb cut variances needed to comply with the NYSDOT, constituting reasonable variance relief that did not negatively impact the surrounding area.

262. Despite this denial by Tedesco, in a letter dated August 8, 2024, Antonelli, the Boards' planning professional, wrote to the Planning Board and BZA, stating that after his review of version 22 of the site plan dated July 15, 2024, it was responsive to Tedesco's July 11, 2024 requests.

263. Left with no option, the Chabad sent a letter dated August 19, 2024 appealing the August 6, 2024 denial to the BZA.

264. The Chabad sent a letter dated September 17, 2024 to the BZA reminding them that the review of the Chabad's application was subject to RLUIPA.

265. On October 1, 2024, the BZA held a hearing on the Chabad's appeal from the August 6, 2024 denial of the Chabad's revised site plan dated July 31, 2024.

266. The BZA chair stated in the October 1, 2024 hearing that the BZA had been holding the Chabad's application in abeyance from the required Planning Board review under Village Code Section 205-21 while it deliberated on the application.

267. As stated previously, Village Code Article VI Section 205-21(A)(2)(a) requires a report to be issued within 90 days of a hearing, which occurred on August 21, 2017.

268. At the hearing, the BZA Chairman acknowledged that the Chabad's revised plan "has received approval of the proposed plan from both NYSDOT and the Nassau County Department of Health."

269. Part of the hearing's stated purpose was to continue the BZA's burdensome SEQRA review, marking the seventh year of the BZA's SEQRA review since it appointed itself as lead agency.

270. The Chabad reiterated that the purpose of its plan was to have a space in which its existing congregation could engage in religious worship and religious education, while allowing the existing residence to be a functioning home for Rabbi Heber and his family.

271. The Chabad reiterated that the NYSDOT had approved the Chabad's plan and highway work permit, finding "absolutely no safety issues."

272. The Chabad reiterated Nassau County Department of Health's approval of the sanitary plan and imposition of an occupancy limit of 196 "with which the applicant will strictly comply."

273. The Chabad also reiterated to the BZA the Chabad's plans' full compliance with the Village's parking requirements, which also meet the Chabad's parking needs.

274. The Chabad's engineer testified that the Chabad's planned 54 parking stalls, 2 for the residence and 52 for the proposed building, met Upper Brookville's parking requirements based on the 196-occupant limit that the County approved.

275. The Chabad's engineer testified that the drainage exceeds most municipalities' drainage average requirements, the lighting plan is dark-skies-compliant, and the landscaping plan preserves as many of the perimeter trees as possible while still complying with NYSDOT guidelines on sidewalks.

276. The Chabad's traffic engineer testified that–even in a conservative analysis–there was no significant increase in traffic based on the project, and where there was even a potential increase with Old Wheatley Road, the Chabad worked with the NYSDOT to mitigate any

potential negative impact by changing the striping on New York State Route 107 and realigning the Chabad's driveway.

277. In relation to questions about parking, the Chabad clarified that although the parking meets the Village Code requirements, many congregants walk to and from the Chabad, lessening the amount of parking that would actually be needed by congregants.

278. The Chabad explained to the Board that the parking variance which the building inspector required was based not on Village Code standards for a religious use, but based on a building code occupancy level for each space in the proposed building, and which would be impermissible occupancy levels based on the Nassau County Health Department's occupancy approval.

279. The Chabad reiterated to the Board that the NYSDOT has exclusive jurisdiction over New York State Route 107 and had deemed the Chabad's plan safe, granting it approval.

280. Rabbi Heber further testified to the Board about each individual space in the proposed building allowing the Chabad and its congregants to have a synagogue that meets their needs to practice their faith.

281. This new space, as Plaintiff Rabbi Heber testified, included bathrooms that are more accessible, a kosher kitchen, a sanctuary with greater space for worship, in particular sufficient space for the *bima* seat (the area of a Chabad or Synagogue where the Torah is read and service is conducted), for presenting and dancing with the Torah, and for separating the congregation by gender for worship, a *kiddush* room accommodating all congregants, an office for the Rabbi and the school, educational classrooms, a *mikvah*, a lobby, a multipurpose room, a library, a boardroom, and a space for the youth group.

282. In response to a question from Antonelli about the difference between a bar or bat

mitzvah and a party, Plaintiff Rabbi Heber explained that bar and bat mitzvahs begin in a sanctuary with the reading of the Torah then move to the *kiddush* room for family speeches and a celebration with food, not like a dance party in an event venue.

283. Despite the Chabad and Rabbi's willingness to meet with the BZA members and Upper Brookville officials to discuss their plans and reach a positive resolution, their willingness to engage in good faith discussions has been met with hostility from the BZA and Upper Brookville.

284. On October 30, 2024, the BZA issued a "Positive Declaration" under SEQRA, more than seven years after declaring itself lead agency under SEQRA. In doing so, and despite the many years of being repeatedly provided with the same information, the BZA determined that the following "further study and consideration" will now be required yet again:

a. Impact on land and adjacent neighboring properties: due to the magnitude of the project, it is likely that the duration of construction may take more than a year to complete. Mitigation measures to protect the surrounding residential neighborhood must be considered and addressed.

b. Impact on a Critical Environmental Area (CEA) is likely where wastewater discharge to groundwater other than by low density residential in a Special Groundwater Protection Area is proposed.

c. Impact on aesthetic resources on NYS Route 107 and neighboring residential properties are likely due to the visibility of the structure, its size, height, proportions and location on the property which will be amplified by the removal of the substantial existing screening along the roadway and interior boundary lines.

d. Impact on neighboring properties and the community at large are likely due to the extensive removal of large mature screening with minimal replacement planting that will have an immediate adverse impact due to excessive noise and light. Mitigation measures must be considered and addressed.

e. The proposed action is in violation of several sections of the Village Code. Following is a list of those violations of the Village Code, many of which, either individually or in the aggregate, may reasonably be considered

significant:

1. Religious use in the Village requires a 6-acre minimum lot area pursuant to §205-20C of the Village Code; the Applicant's lot contains 2 acres,

2. The proposed principal building would have a front yard setback of 35.1 feet where the front yard setback requirement is 75 feet pursuant to §205-10E of the Village Code;

3. Parking is proposed within the front yard where no parking is permitted pursuant to §205-15E(4) of the Village Code;

4. The proposed site trash enclosure is proposed to be 3.5 feet from the rear lot line rather than the required 50-feet pursuant to §205-10E of the Village Code,

5. There are proposed patios within 40 feet of the rear lot line where there is a 50-foot rear yard setback requirement pursuant to §205-10E of the Village Code;

6. The proposed new building will have a volume of more than 205,000 cubic feet, where the maximum allowable is 90,000 cubic feet pursuant to §205-10D(1)(a) of the Village Code,

7. The proposed building coverage is 18.84% where 15% is permitted pursuant to §205-10E of the Village Code;

8. The play area is within 2-feet of the northerly property line, adjacent to a residential parcel, where 50 feet is the required setback pursuant to §205-10E;

9. The proposed floor area would be in excess of 6,700 square feet in the new Chabad building and 3,100 in the existing dwelling where 2,200 square feet is the maximum allowable pursuant to §205-10E of the Village Code.

f. Impacts on land use will likely occur due to the action's noncompliance with the existing zoning regulations as it pertains to the property lot size and setbacks. The scope and intensity of the action, along with its components and accessory uses being proposed must be further considered and reviewed to mitigate the numerous variances being requested. The Applicant should specify all proposed uses for the main structure, the anticipated intensity and other details pertaining to said uses to see if mitigation measures or alternative actions could be employed or considered that would be more in compliance with the existing zoning

regulations.

g. Impacts on transportation have been raised and must be addressed pertaining to the details of NYSDOT approval and the extent to which the increased traffic generated by the action will impact current and future traffic conditions, road network capacity and the impact on motorists from the Village of Brookville accessing the NYS Route 107.

h. Impacts on future transportation will occur on NYS Route 107 and its intersection with NYS Route 25A which is an extremely busy, heavily traveled intersection. The Applicant should provide the Board with the projected future increases in traffic at this intersection utilizing NYSDOT data, along with the projected growth of the congregation. Mitigative measures or alternative actions that may be employed must be addressed to accommodate the anticipated congregation growth and the traffic increase on the existing road network.

i. Off-street parking for the action must be studied to ensure access to the site for all proposed uses and types of vehicles, along with adequate parking for those vehicles. The parking areas must be sufficiently screened to protect the neighboring properties [sic] privacy and enjoyment of their property. The Applicant must address the maximum parking required for all events occurring during the year. If overflow parking demand is anticipated, how will that demand be met and accommodated.

j. Impacts on noise or light on neighboring properties and the community at large that are due to the proposed action need to be further studied. What mitigation measures or alternative actions could be employed or considered to minimize any adverse impacts due to the increase in noise and light.

285. Besides the fact that all the information requested in the Positive Declaration had already been provided by the Chabad in the application process, the Positive Declaration's demands will further delay the Chabad's application by several additional years and will cost the Chabad hundreds of thousands of dollars in additional expense.

286. The purported "violation[s]" of the zoning code within the Positive Declaration are overstated and do not justify a finding that the action will have a significant adverse impact on the environment; for example, as stated above, the Positive Declaration claims the play area, pool, and patios require variances; however, both the play area and patio are structures that have

existed for over two decades and have certificates of occupancy.

287. In making a Positive Declaration under SEQRA, the Village necessarily purports to claim that the Chabad's modest synagogue may have a significant negative impact on the environment, despite it being proposed on a major street, adjacent to a gas station, with a large church across the street.

288. The determination of a Positive Declaration is intended to further delay the Chabad's application.

289. There have been no hearings on the Chabad's application since October 1, 2024.

290. Defendants' actions substantially burden the Chabad's congregants' exercise of religion by depriving them of the ability to exercise their religion in a house of worship that conforms with their religious beliefs and provides sufficient space for worship within reasonable walking distance of their homes.

291. Upper Brookville's zoning regulations that pertain to the religious use of property within its jurisdiction, and its application of these regulations to the Chabad, create substantial uncertainty, delay, and expense for Plaintiffs.

292. As referenced above, the significant delays in the Village of Upper Brookville's review of this application continue to prevent the Chabad from constructing a house of worship that meets its needs.

293. The Chabad has submitted more than one meaningful application, submitting one building permit application, an application for a conditional use permit, and an application for variances.

294. Further delay by the BZA will place the NYSDOT's second approval at risk of expiring, costing the Chabad additional time, resources, and expense through no fault of its own.

295. The continued pattern of delay by the Village and its demonstrated intent to prevent construction of a place of worship on the Property make clear that further consideration of the Chabad's application by the BZA would be futile.

296. Through the application process and the related hearings regarding the Chabad's efforts to accommodate its current congregation, the Chabad has been subjected to discriminatory statements and conduct from the neighboring Village of Brookville and objectors at hearings.

297. The neighboring Village of Brookville included a story in its newsletter publishing an unsubstantiated claim that the Chabad created "unsafe conditions," creates "hazards" with congregants' parking, and including an unsubstantiated claim that a pedestrian "who was crossing Rte. 107 to go to the Chabad was struck by a car and injured," which was false.

298. Various objectors have directed hostile statements against the Chabad and its plans to build a Chabad including the following:

a. A document dated May 23, 2017, was shared with the BZA purporting to speak for a group of individuals "vehemently opposed" to the Chabad's application.

b. In the September 12, 2019 hearing, one objector stated "[r]ules and regulations are in place to protect our greatest asset: our home. It is inappropriate and offensive to ask this board to approve an expansion of this magnitude."

c. The Chabad's neighbor, a current member of the BZA who had recused himself from the matter, created a presentation in opposition to the Chabad for the September 12, 2019 hearing, where he called the Chabad's plan a "monstrosity."

d. In an email dated September 17, 2019 to the Upper Brookville Attorney claimed that the Chabad's plan "negatively impacts" Upper Brookville's "quality of life," ending that the Chabad needs to "relocate" somewhere else.

e. During the October 1, 2024 hearing's public comment, an objector hostilely stated that the Chabad's plan sacrifices "the quality of life" for the area.

f. During the October 1, 2024 hearing's public comment, an objector hostilely stated that "[o]pening a house of worship was a sneak attack" on neighbors.

g. During the October 1, 2024 hearing's public comment, an objector hostilely commented that variance requests by the Chabad were "nothing short of an assault on the zoning regulations."

h. During the October 1, 2024 hearing's public comment, a commenter stated they would give the Chabad $250,000 if it could find another location with 6 acres.

299. Upon information and belief, "quality of life" is a phrase frequently used by those in opposition to Orthodox Jewish religious land uses.

300. Upon information and belief, "sneak attack" is a common trope used against Orthodox Jews seeking to expand into new areas in the tri-state area as their population expands.

301. The Chabad has been treated worse than the Church of the Holy Resurrection (the "Greek Orthodox Church") diagonally across the road from the Chabad in the neighboring Village of Brookville.

302. The Village of Brookville, which has strongly opposed the Chabad's application, granted a conditional use permit and a variance allowing for the significant expansion of the Greek Orthodox Church across the street from the Chabad while simultaneously actively opposing the Chabad's smaller proposed building.

303. The Greek Orthodox Church's expansion included a 17,858-square foot gymnasium, variances for parking lot coverage 6,377-square feet above what is permitted and maximum permitted height of a building.

304. While the Chabad has been required to conduct multiple, extensive traffic studies and respond to the Village of Brookville's traffic report, the Greek Orthodox Church, which

shares New York State Route 107 with the Chabad, was never questioned by Upper Brookville about its traffic studies, despite greater impacts on New York State Route 107 traffic.

305. The Village of Upper Brookville did not object to or even comment on the Greek Orthodox Church's large expansion plan.

306. The Village of Brookville approved the Greek Orthodox Church's expansion plans.

307. Before, during, and after the Village of Brookville reviewed and approved the Greek Orthodox Church's expansion plans, the Village of Brookville was requesting that the Village of Upper Brookville do extensive studies of the Chabad's traffic plan, even when the plan had already been approved by the NYSDOT.

308. Despite the years of questioning, letters, and unnecessary delay regarding the Chabad's application and its implications on New York State Routes 25A and 107 by the Defendants, the Defendants have reported not having any concerns regarding the Greek Orthodox Church's 17,858-square foot expansion in the Village of Brookville, which is diagonally across from the Chabad, bordering both New York State Routes 25A and 107.

309. The Defendants' zoning scheme and its application to the Chabad has rendered the Chabad's religious exercise effectively impracticable.

310. By not permitting Houses of Worship as a permitted use by right anywhere within Upper Brookville pursuant to its zoning code, Upper Brookville has unreasonably limited houses of worship.

311. Upper Brookville has unreasonably limited religious exercise within the Village by requiring a six-acre lot size as a condition for the building of a house of worship.

312. Upon information and belief, there are no available parcels six acres or greater in

Upper Brookville on the market.

313. Upon information and belief, only a small fraction of the total lots in Upper Brookville are greater than six acres, and such lots are either devoted to other uses, improved with multi-million dollar homes, or are otherwise unsuitable for the Chabad's use.

314. Even if such parcels were available, the Chabad could not afford to purchase a parcel that size. The three five-acre parcels that are currently on the market as indicated by Zillow.com are offered at $5.95 million to $7.95 million.

315. The six-acre requirement for a "Church" in Upper Brookville is a prohibitive cost to houses of worship in Upper Brookville and is excessive for modestly sized houses of worship like the Chabad designed for fewer than 200 worshippers.

316. If the Chabad was permitted to operate on the Property, its construction and ongoing operation would affect interstate commerce.

317. The construction of the Chabad would affect interstate commerce by the purchase and use of goods and services that travel in interstate commerce and involve instruments of interstate commerce, including construction materials, construction equipment, construction services, architectural services, and engineering services.

318. The Chabad's operation would affect interstate commerce by or through, among other things, serving as a site for ongoing fundraising; its receipt of charitable donations from persons working or living outside of the State of New York; providing a house of worship for the families of congregants visiting from other states; the use of means of interstate communication to facilitate the Chabad's ongoing operations; the use of interstate travel related to the Chabad's ongoing operations; the employment of any part-time or full-time employees; the purchase of goods and services related to the Chabad's ongoing operations and maintenance; and hosting

religious leaders visiting the Chabad's religious community from out of state.

319. The Defendants' actions described above all took place under color of state law.

320. Under New York law, "[i]t is well settled that, while religious institutions are not exempt from local zoning laws, greater flexibility is required in evaluating an application for a religious use than an application for another use and every effort to accommodate the religious use must be made." *Genesis Assembly of God v. Davies*, 617 N.Y.S.2d 202, 203 (1994).

321. The harm to the Chabad caused by the Defendants' laws and actions, which prevents it from operating a house of worship to accommodate its religious needs, is immediate and severe.

322. Defendants' laws and actions imminently threaten the Chabad's free exercise of religion.

323. There are no quick, reliable and viable options for Plaintiffs to construct a facility in Upper Brookville.

324. The Chabad has no adequate remedy at law for the harm and damage caused by Defendants' wrongful laws and actions.

325. The Chabad had also suffered significant financial damages as a result of the Defendants' laws and their application to the Chabad, such as costs related to its building permit application, variance and conditional use applications, expert reports, and required additional expenditures to attempt to conduct activities and gatherings outdoors to accommodate the congregation.

## COUNT I

**Violation of Religious Land Use and Institutionalized Persons Act of 2000 – "Substantial Burdens"**
**42 U.S.C. § 2000cc(a)**

326. Paragraphs 1 through 325 are incorporated by reference as if set forth fully herein.

327. Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations on their face and as applied in a manner that places substantial burden on the Plaintiffs' religious exercise without using the least restrictive means of achieving a compelling governmental interest.

**COUNT II**

**Violation of Religious Land Use and Institutionalized Persons Act of 2000 — "Exclusion and Limits": Unreasonable Limitation 42 U.S.C. § 2000cc(b)(3)(B)**

328. Paragraphs 1 through 327 are incorporated by reference as if set forth fully herein.

329. By delaying the Chabad's application, Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by implementing land use regulations both on their face and as applied to Plaintiffs in a manner that unreasonably limits religious assemblies, institutions, and structures within their jurisdiction.

**COUNT III**

**Violation of Religious Land Use and Institutionalized Persons Act of 2000 – "Nondiscrimination" 42 U.S.C. § 2000cc(b)(2)**

330. Paragraphs 1 through 329 are incorporated by reference as if set forth fully herein.

331. Defendants have deprived and continue to deprive the Chabad of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied to Plaintiffs in a manner that discriminates against the Chabad on the basis of religion and religious denomination.

**COUNT IV**

**United States Constitution**
**42 U.S.C. § 1983: First Amendment**
**Free Exercise Clause**

332. Paragraphs 1 through 331 are incorporated by reference as if set forth fully herein.

333. Defendants have deprived and continue to deprive the Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by imposing and implementing land use regulations on their face and as applied in a manner that burdens the Chabad's religious exercise without using the least restrictive means of achieving a compelling governmental interest, and by discriminating against the Chabad on the basis of religion.

**COUNT V**

**United States Constitution**
**42 U.S.C. § 1983: Fourteenth Amendment**
**Equal Protection Clause**
**Religious Discrimination**

334. Paragraphs 1 through 333 are incorporated by reference as if set forth fully herein.

335. Defendants have deprived and continue to deprive Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against and targeting Plaintiffs for disfavor on the basis of their religion.

**COUNT VI**

**United States Constitution**
**42 U.S.C. § 1983: Fourteenth Amendment**
**Equal Protection Clause**
**Racial Discrimination**

336. Paragraphs 1 through 335 are incorporated by reference as if set forth fully herein.

337. Defendants have deprived and continue to deprive Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States

Constitution, by discriminating against and targeting Plaintiffs for disfavor on the basis of their race.

**COUNT VII**

**42 U.S.C. § 1981**

338. Paragraphs 1 through 337 are incorporated by reference as if set forth fully herein.

339. Plaintiffs Menachem Heber and Shifra Heber are members of the Jewish race.

340. The actions by Defendants are violations of the Plaintiffs' right to make and enforce contracts as other persons regardless of race in violation of 42 U.S.C. § 1981.

341. Defendants have caused the Plaintiffs to suffer, and to continue to suffer, damages and irreparable harm.

**COUNT VIII**

**42 U.S.C. § 1982**

342. Paragraphs 1 through 341 are incorporated by reference as if set forth fully herein.

343. Plaintiffs Menachem Heber and Shifra Heber are members of the Jewish race and are citizens of the United States.

344. The actions by Defendants are violations of the Plaintiffs' right to lease, hold, and convey real and personal property as other persons regardless of race in violation of 42 U.S.C. § 1982.

345. Defendants have caused the Plaintiffs to suffer, and to continue to suffer, damages and irreparable harm.

**COUNT IX**

**Violation of the Fair Housing Act**
**42 U.S.C. § 3604(a)**

346. Paragraphs 1 through 345 are incorporated by reference as if set forth fully herein.

347. Defendants, through their actions and the actions of their agents described above, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3604(a), under which it is unlawful to "[t]o sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religious, sex, familial status, or national origin."

## COUNT X

**Violation of the Fair Housing Act**
**42 U.S.C. § 3604(b)**

348. Paragraphs 1 through 347 are incorporated by reference as if set forth fully herein.

349. Defendants, through their actions and the actions of their agents described above, are liable under 42 U.S.C. § 3604(b), which makes it unlawful to "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religious, sex, familial status, or national origin."

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully request that this Court grant the following relief:

1. A declaration that Defendants' laws and actions described herein, including the BZA's determination of a Positive Declaration under SEQRA, are void, invalid and unconstitutional on the ground that they violate the Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, the Free Exercise Clause of the First Amendment to the United States Constitution, and the Equal Protection

Clause of the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. §§ 1981 and 1982;

2. Preliminary and permanent orders enjoining Defendants from preventing the Chabad from using its Property as a synagogue as described in Plaintiffs' site plan;

3. Preliminary and permanent orders directing the BZA to grant the Chabad's applications for a conditional use permit and variances;

4. Preliminary and permanent orders directing the Defendants to issue building permits, conditional use permit for religious use, variance relief or determinations that variances are not required for specific items, and architectural and site plan approval, permitting the development of the Property as a synagogue as described in Plaintiffs' site plan;

5. Preliminary and permanent orders enjoining the Defendants, their officers, employees, agents, successors and all others acting in concert with them from applying their laws in a manner that violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, or 42 U.S.C. §§ 1981 or 1982, or undertaking any and all action in furtherance of these acts;

6. An award of compensatory, consequential, presumed, and punitive damages against Defendants in favor of the Plaintiffs as the Court deems just for the loss of their rights under the First and Fourteenth Amendments to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Fair

Housing Act, and 42 U.S.C. §§ 1981 and 1982 incurred by the Plaintiffs and caused by the Defendants' laws and actions;

7. An award to the Plaintiffs of full costs and attorneys' fees arising out of Defendants' actions and land use decisions and out of this litigation; and

8. Such other and further relief as this Court may deem just and appropriate.

Dated: February 19, 2025

**STORZER & ASSOCIATES, P.C.**

By: s/ Eric W. Treene
ERIC W. TREENE
1025 Connecticut Ave., N.W.
Suite One Thousand
Washington, D.C. 20036
Tel: 202.857.9766
Fax: 202.315.3996
treene@storzerlaw.com

*Attorney for Plaintiffs*

**MAHON & BERGER, ESQS.**
LAWRENCE BERGER
70 Glen Street Suite 395
Glen Cove N Y. 11542.
Phone: 516 671 2993.
lberger@lbfedlaw.com

*Attorney for Plaintiffs*